SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS - CRIMINAL TERM - PART 16
--------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK :
Indictment No.
-against- 1192/2003

DUPREE HARRIS, :

Defendant. :
--------------------------------------X
TRIAL 360 Adams Street
Brooklyn, New York
July 22, 2004

B E F O R E: HONORABLE CAROLYN DEMAREST, J.S.C.

Justice and Jury

A P P E A R A N C E S:

(Appearances as previously noted.)

SANDRA WILKES, RPR
Senior Court Reporter

COURT CLERK: This is number two on the calendar, indictment number 1192 of 2002, Dupree Harris.

MS. RICHMAN: Good morning. Stacey Richman, of counsel to the office of Murray Richman, on behalf

of Mr. Harris.

MR. BENSON: Mitchell Benson for the People.

THE COURT: I think all the jurors are here and we're ready to proceed. I understand Mr. Solano is going to be the first witness to proceed, and you're going to move right into the complainant, right?

MR. BENSON: Yes.

THE COURT: I don't know if we -- there was some discussion at the bench.

MS. RICHMAN: My concern, and I think the Court has indicated, Mr. Solano will not be permitted to testify that Bobby Gibson was the only person who went into the Grand Jury, because what you said at the bench, and my concern, and what appears to be the purpose of the prosecution is through innuendo get a conviction on Mr. Harris for this because Mr. Gibson, being the only witness that testified supposedly in the Grand Jury, was shot and killed and supposedly he had a statement here, "take the money or take the bullet," which is contended never happened. However, again it's all about innuendo, and I cannot defend against this innuendo. He's not charged with that crime. It's obviously a prominent or the major concern of the highest course of my counsel. My concern is I have no way to safeguard this. This should be a trial about

what happened with these three young women.

I also will bring up the point, when Ms. Edmonds testified she had testified during the Sykes case that she didn't want to end up dead like Dennis and K and that's why she did it, but that relates to something that happened after the fact and I don't believe they should be able to elicit that statement either because there's no relationship between the death of Bobby Gibson, and Mr. Harris, as the Court has pointed out, it's been tried and determined already.

THE COURT: Well, counsel, we haven't heard from Mr. Benson yet, and I don't think it's necessary to specifically elicit who the witnesses were at the Grand Jury with respect to the indictment of Wesley Sykes to make the case that the People are intending to present. We already have testimony through the detectives regarding certain witnesses that they had interviewed and their availability and whether they were identified, and I believe Detective Mosely specifically has identified five people, including these three complainants. There were other, several other -- one of them I think is the deceased.

MS. RICHMAN: Yes.

THE COURT: So I mean Dennis Brown was one of

the ten that were identified. And then there were two other people, at least two who never were identified beyond some street name or whatever. They never knew who that person was and that's already been brought out.

MS. RICHMAN: But Mr. Solano did have contact with one of them and he does refer to them.

THE COURT: Are you going to be inquiring about that?

MS. RICHMAN: I may be, your Honor, because now that the People have caused a question on that, I think that I have the right to bring that in to balance the testimony.

THE COURT: Well, are you -- you're certainly not going to be precluded from that. But since you're the one who doesn't want to bring out who did appear or who did participate in the prosecution, I'm kind of confused here. You either want it in or you want it out.

MS. RICHMAN: The issue becomes the implication of the People that they wish to bring forward.

THE COURT: Let's go back.

Mr. Benson, who testified?

MR. BENSON: Bobby Gibson was the only

civilian witness who testified.

THE COURT: Otherwise there were only police officers?

MR. BENSON: Right.

THE COURT: So none of these other people ever gave testimony per se?

MR. BENSON: In front of Grand Jury, Bobby Gibson was the only one.

THE COURT: Well, I can understand your concerns there, but there has been a trial regarding the death of Bobby Gibson. Someone has already been convicted, and apparently the evidence in the case would support the suggestion that the person, that Bobby Gibson was murdered for some reason not necessarily related to this case. So to persist in making the implication that that was the motive I think is somewhat disengenuous. I think the issue regarding the murder of Bobby Gibson is relevant to this case because of the impact that it had on the witnesses, the complainants in this case. And for that reason it is not inappropriate for you to bring out the fact that they knew that he had been murdered over that weekend, but to suggest beyond that that somehow this defendant was responsible for the murder. I mean, they may make that connection, and I don't preclude you from

eliciting testimony from them regarding their state of mind in response to that information. I'm not precluding that. But to independently start going back into how you prosecuted the case against Wesley Sykes and who the witnesses were I think is really collateral at this point, and I'm talking about through your office and through the prosecution of the case, per se.

MR. BENSON: Well, judge, I'd just like to be heard on that. Perhaps, I think Ms. Richman has made the best logical argument for why I think the things are related in this sense. Assume there are nine witnesses to the murder and nobody was killed. Just nine witnesses. And we have evidence that the defendant approached three of them to convince them not to testify. Ms. Richman's logic is this, that that doesn't make sense because there are six other witnesses. So why would someone approach just three and not try to do anything to eliminate the other six, and that was her effort to show the large number of witnesses. And the logical implication is clear, and I'm certain she's going to argue to the jury why would he just concern himself with three people when there were other people out there, for that reason the whole, it doesn't make sense in terms of motive. If another witness is killed which the jury knows about,

Ms. Richman is going to say that is just a coincidence that a person who was a witness died, it's not related to this case and even still there's one person who died and three witnesses who were bribed and look at all the other witnesses.

My point is that the Court keeps coming back to me saying that Harris is responsible for the death of Bobby Gibson and that doesn't have to be the case at all. Because for example Sykes could engineer this. Sykes could decide who he wants to have help him, take care of different people. I'm saying his only role, all he did was approach and bribe three people.

Now, the fact that he's not implicated or responsible for the death of someone else shouldn't preclude the jury from having a picture that he's responsible for bribing three people. In the larger context, maybe somebody else was responsible for other people. She wants to suggest that nobody else was touched. All these other witnesses were untouched so therefore it didn't make sense for him to approach three witnesses.

I'm saying if, and I know the Court hasn't allowed me to use the Gibson death for these reasons, but I'm saying it's fair and logical if there was a total of four witnesses to say look, one is dead and he

took care of three of them. He eliminated three of them. And the fact that another one was killed puts it in context and makes it illogical. She's trying to show because there were so many other witnesses it's not logical. That's one thing I want to say.

The other thing I want to say, the fact that Travis Ragsdale was not convicted of tampering a witness doesn't resolve the issue of whether he was killed for tampering of a witness and the Court knows if we have two defendants charged acting in concert of one another and they have separate trials and one person goes to trial and he names his co-defendant and he's found not guilty, that doesn't mean that the person who hasn't yet been tried, that there's no evidence that he was involved in the murder as well.

THE COURT: Mr. Benson, my problem is what you keep coming back to is the second argument you're making that you want to create a inference that Mr. Harris somehow should have been a co-defendant in the homicide prosecution of Mr. Ragsdale and that's very troubling and this is where I have to say that Ms. Richman has a point.

I do understand now that your argument with respect to the first point is not unreasonable to say that the fact that some witness was eliminated by

perhaps just coincidence or by some other reason but whatever it was, now the field is narrowed and whatever or you're saying the implication is there was a plan of which Mr. Harris was party to eliminate the witnesses, not that he killed one of the witnesses but that he was trying to eliminate the three that are the complainants here.

Now, that's within the parameters of this case. But my problem arises when you take that second step and you seem to keep taking that step to suggest that Mr. Harris is guilty in some way of the murder of Bobby Gibson, and this is where I have a problem with argument.

MR. BENSON: I'm saying he doesn't have to be responsible for the murder of Bobby Gibson or even have been aware of a plan. All he has to be aware he was going to approach these three witnesses.

THE COURT: That's right. So how relevant is it to paint the picture of how many witnesses there were at the Grand Jury? You're going to establish that these three young women did not testify at the Grand Jury, that's already been brought out. You can bring it out again by Mr. Solano.

MR. BENSON: I can abide by that. You don't want to mention that Bobby Gibson was the person that

went to Grand Jury.

THE COURT: Can we bring up the jury?

MR. BENSON: I need to talk to him and make sure he understands. And secondly, I may ask for a short recess to make sure.

MS. RICHMAN: Your Honor, just to clarify, may I have the video tape of Mr. Ragsdale's confession because it seems as evidence that comes in. This seems something relevant we may wish to play for the jury. Because he very simply states he was out drunk that night.

THE COURT: I told you you'd get it. I'm not saying you're going to get it into evidence. You have said you already seen a transcript.

MS. RICHMAN: I've seen a transcript.

THE COURT: This is a matter of open discovery. She has a right to view it and make an evaluation if she even wants to proffer it.

MR. BENSON: Actually, I've turned it over. And in the spirit of greater discovery under the CPL Ragsdale confession is not, she's aware of it in case there's any Brady implication. But he's not a witness I'm going to call here. I think technically I wasn't obligated to do it, but I'm going to turn it over.

MS. RICHMAN: My concern it is indeed Brady

because of all of the innuendos.

THE COURT: Well, listen, you've got it counsel.

MS. RICHMAN: Thank you.

THE COURT: Let him talk to Solano and get that ready to go.

(At this time, there was a short pause and the matter subsequently resumed.)

THE COURT: All right, bring in the jury.

COURT OFFICER: Jury entering.

COURT CLERK: The attorneys stipulate that the jury is present and properly seated and waive the reading of the roll call?

MS. RICHMAN: Yes. Thank you.

MR. BENSON: Yes.

THE COURT: Good morning, jurors. Thank you for the phone call about the delay. We appreciate that information.

We are ready to proceed Mr. Benson.

MR. BENSON: People call Assistant District Attorney Javier Solano.

(At this time, the witness enters the courtroom.)

COURT CLERK: Please raise your right hand. Do you solemnly swear or affirm that the testimony you

are about to give will be the truth, the whole truth, and nothing but the truth so help you God?

MR. SOLANO: Yes.

COURT CLERK: Thank you. Please be seated.

Now in a loud voice for the record, could I have your name?

MR. SOLANO: Javier Solano.

COURT CLERK: Would you spell both names for me, please.

MR. SOLANO: Javier, S as in Sam O-L-A-N-O.

COURT CLERK: Which borough do you reside in?

MR. SOLANO: Manhattan.

THE COURT: You may proceed.

J A V I E R S O L A N O, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BENSON:

Q Mr. Solano, how long have you been employed by the Kings County District Attorney's office?

A This October will be eight years.

Q And what unit are you currently assigned to?

A I'm in the homicide bureau.

Q Actually, you and I work in the same unit?

A Yes, we do.

Q Am I your supervisor?

A Yes, you are.
Q Was that the situation back in October of 2001?
A Yes.
Q And I'd like to direct your attention to October 25, 2001. Were you assigned a case to prosecute?
A Yes, I was.
Q And who was the defendant in that case?
A Wesley Sykes.
Q Did that involve a shooting that happened on September 24th, September 4, 2001?
A Yes, it did.
Q In Brooklyn?
A Yes, it did.
Q Now, are you aware of the day that Wesley Sykes was taken into custody and the day the identification procedures were performed?
A Yes, I am.
Q What was your awareness of that?
A He was taken into custody on October 22 of 2001 and lineups were conducted on October 23, 2001.
Q So now with the arrest by the detectives, then on October 25th did there come a stage of the proceedings that you were responsible for?
A Yes.
Q And what was that?

A Beginning to present it to the Grand Jury.

Q Now, did the detectives bring any numbers of witnesses to the district attorney's office for you to interview?

A Yes, I recall that they did.

Q And did you present any witnesses to the Grand Jury?

A Yes, I did.

Q And how many of the witnesses did you present to the Grand Jury? In terms of number, how many did you actually have testify?

A In terms of all the witnesses or witnesses to the actual event?

Q Did you just -- let me phrase it this way. Did you have one witness testify in the Grand Jury itself? Did you have one civilian?

A Yes, yes.

Q One civilian witness testified in the Grand Jury, is that correct?

A Yes.

Q And there were also some detectives who testified?

A Correct.

Q But with respect to additional witnesses who you didn't present to the Grand Jury -- withdrawn.

And in the Grand Jury people give sworn testimony?

A Yes.

Q But despite not presenting other witnesses to the Grand Jury, did you take sworn statements from those witnesses on October 25th?

A I took sworn statements from other witnesses on October 25, 2001.

Q And are there three females in particular who you spoke to on that day?

A Yes.

Q What were the names of the --

A There was Shaquanna Edmonds. There was, I believe it was Naia Hardison and Latisha Smith.

Q Now, in the District Attorney's office when you take sworn statements, do you record them in any way?

A Yes, I do.

Q How do you record them?

A Audio tape.

Q And is there a numbering we use to keep track of our tapes?

A Yes.

Q I'd like to ask you first about Latisha Smith. You spoke to her on October 25th?

A Yes.

Q And what was the tape number for that?

THE WITNESS: If I may refresh my

recollection, your Honor.

THE COURT: You may.

A Latisha Smith, A as in apple zero one dash zero 7, 3, 4.

Q And did I ask you to bring that tape and others with you today?

A Yes.

Q And did you listen to them before you came to make sure these are the accurate recordings of your conversations with the witnesses?

A Yes, I did.

Q In particular, the one with Latisha Smith, is that tape an accurate recording?

A Yes, it is.

Q And were you asking her about the shooting on September 4, 2001?

A Yes.

MR. BENSON: I'd ask that this tape be admitted into evidence as People's exhibit number 2.

MS. RICHMAN: No objection, your Honor.

MR. BENSON: And played for the jury.

THE COURT: Yes, it is admitted.

Ready to play it? Mr. Benson you want it played?

MR. BENSON: I'm ready. I requested that it

be played.

(At this time, People's Exhibit number 2 being played.)

THE WITNESS: That's the wrong one.

THE COURT: Stop it.

THE WITNESS: It's the wrong tape.

MR. BENSON: Your Honor, has that already been marked into evidence?

COURT OFFICER: Yes.

MR. BENSON: Which tape was marked into evidence?

COURT OFFICER: Naia Hardison.

MR. BENSON: That's fine. Naia Hardison can be --

THE COURT: Approach please, counsel, and could we see whatever it is that has been marked.

(At this time, a bench conference was held off the record.)

THE COURT: Okay, you want to have some clarification.

Before you play it, just a minute.

Mr. Benson, let's clarify.

Q Mr. Solano, did you bring the three tapes with the three women?

A Yes, I did.

Q And is the tape you just picked up Naia's tape instead of Latisha's tape?

A Yes.

Q What's been marked as number two is Naia's tape, Naia Hardison?

A That's correct.

MR. BENSON: I ask that that be admitted into evidence as People's Exhibit number 2, Naia Hardison.

THE COURT: So we have a clear clarification, this particular tape is Naia Hardison, not Latisha Smith.

MR. BENSON: Mr. Solano, next time make sure you --

THE COURT: You're making him nervous Mr. Benson.

(At this time, People's Exhibit number 2 being played.)

Q Mr. Solano, she referred to a person as Dough Boy. Was that a nickname of one of the people involved?

A Yes.

Q Who was that?

A Dennis Brown.

Q So the deceased, his nickname was Dough Boy?

A Yes.

Q She referred to the shooter as having a glass eye.

Did you see -- withdrawn.

Are you familiar with Wesley Sykes appearance?

A Yes.

Q Did he have anything unusual with respect to one of his facial features?

A Yes.

Q What was that?

A I don't know what the condition is, but there's something with his eye. I don't know if it's a little more white or something. It's something different about his eye.

Q Okay. Now, that was Naia Hardison's statement. On the same day did you speak to Latisha Smith?

A Yes.

Q This time carefully pick up Latisha Smith's tape. Do you have it?

A Yes.

Q Did you listen to that?

A Yes.

MS. RICHMAN: We have no objection.

MR. BENSON: I ask that that be admitted as People's number 3.

THE COURT: All right, it is so admitted on consent.

(At this time, People's Exhibit number 3 being played.)

Q Is that an accurate recording of the statement Latisha Smith made?

A Yes.

Q Finished with that.

Now, did you take a statement from Shaquanna Edmonds?

A Yes.

Q What is the tape number of that?

THE WITNESS: May I refresh my memory, your Honor?

THE COURT: You may.

A A zero 1 dash zero 7, 3, 6.

MR. BENSON: I ask that this be admitted into evidence.

MS. RICHMAN: No objection.

THE COURT: It is admitted as People's 4 in evidence.

COURT OFFICER: Play it?

THE COURT: Yes, please play it.

(At this time, People's Exhibit number 4 being played.)

Q Mr. Solano, those are accurate recordings of the three statements you took on October 25th?

A Yes.

Q Now, in addition to those three sworn statements

and other sworn statements, had other sworn statements been taken of previous witnesses?

A Yes.

Q Had anybody said anything about Corey McCollough shooting anybody?

A No.

MS. RICHMAN: Objection.

THE COURT: Sustained.

Q To your knowledge?

MS. RICHMAN: Objection.

THE COURT: Well, sustained as to what some other unidentified person told Mr. Solano.

Q To that point, had Latisha Smith mentioned anybody other than the person with the messed up eye as the shooter?

MS. RICHMAN: Objection.

THE COURT: To Mr. Solano specifically?

MR. BENSON: Well, I'm asking whether he was aware of her mentioning anybody else as the shooter. I wasn't specific to Mr. Solano.

THE COURT: Well, I'm going to have to sustain.

Q In any event, the case went forward against Wesley Sykes?

A Yes.

Q And had anybody mentioned Corey? Did anybody say

anything --

MS. RICHMAN: Objection.

THE COURT: Sustained.

Q So the case was against Wesley Sykes?

A Yes.

Q And the case proceeded to trial?

A Yes.

Q Was there a time when the case was ready for trial?

A Yes.

Q When was that?

A When you say "ready for trial," when it was actually going to go to trial?

Q That's right.

A That was in June I believe of 2002.

Q And you were the A.D.A. that was supposed to try the case?

A Yes.

Q Did you have a conflict?

A Yes.

Q And just explain what that was?

A As an assistant you sometimes have more than -- normally you have more than one case, and I had two cases, Wesley Sykes being one of them and another case going to trial at the same time. And so my conflict was obviously

since I couldn't be in two courtrooms at once, I had to give one case to another assistant to try.

Q And did you ask your supervisor to have it reassigned?

A Yes.

Q Who was it assigned to?

A It was assigned to Assistant District Attorney Steven Murphy.

Q Was that either in June itself or very close to the trial date?

A If my recollection is correct, it was a few days I believe before the trial was supposed to begin.

Q Now, as that trial date neared, right, were you aware of who the defense attorney for Wesley Sykes was?

A Yes.

Q Who was that?

A Michael Warren.

Q And had anybody communicated to you that any of the witnesses had gone to visit Michael Warren?

A No.

Q You are unaware of Latisha, Naia or Shaquanna having gone to Warren?

A No, I didn't know anything about that.

MR. BENSON: No further questions of this witness.

THE COURT: Cross.

CROSS EXAMINATION

BY MS. RICHMAN:

Q Good morning Mr. Solano.

A Good morning.

Q Just a couple of follow up questions.

In your management of the case you have to have ongoing witness contact, is that correct?

A It would be nice.

Q And often it's difficult?

A Sometimes.

Q And often witnesses don't want to stay involved, is that correct?

A Sometimes.

Q And in this particular case you received a number of telephone calls from these girls earlier in the year that they didn't want to participate any longer, is that correct?

A I mean the best way I can answer that is I know I received calls from them at some point during the pendency of the case.

Q Can you check your notes for the dates of those?

A I don't have any notes regarding any times that they called, but I know that they called during the pendency of the case.

Q And they just didn't want to participate any

longer, is that correct?

A I wouldn't say didn't want to participate. I think it was more they had reservations about testifying like so many witnesses do on a murder case.

Q And did you have a discussion specifically with, I believe it was Ms. Hardison called you early, very early in June and told you she didn't want to participate in the case?

A Like I said, I don't have any specific recollection about a conversation like that. But I can't say something like that didn't happen when she could have called me and said, you know, I'm nervous about testifying. I mean --

Q But it's typical in what you do for a living, correct?

A I wouldn't say typical, but it happens. It happens.

Q And it happens frequently in these type of cases, correct?

A Again in terms of frequently or typically, I can just say that it happens.

Q It's not necessarily out of the ordinary?

A That's correct.

Q Now, Ms. Hardison actually had said that she had identified a silver gun, is that correct?

A I believe in her statement was that she thought it was silver.

Q And you did not turn over a witness list in this case because you transferred the case, is that correct?

A That's correct.

Q And through the termination of your involvement with the case, defense counsel had no idea who the witnesses were, is that correct?

A Well, in terms of what the defense counsel knew, I don't know. I know that I didn't turn over a witness list to the defense attorney.

Q And in fact typically in these cases when you turn over discovery, all the names are redacted, they're blacked out, is that correct?

A Typically, yes.

Q And that was the case in your presentation of discovery in this case?

A That is correct.

Q And that was the end of your involvement with this case, is that correct?

A Well, the end of my involvement was when I turned it over to Steven Murphy.

Q And do you have a date on that? Do you know what date you turned it over to Mr. Murphy?

A As I sit here I can't say it was June 19th. All I

know is it was very near the time because I remember specifically speaking to Murphy I believe the weekend before it was going to start because we were preparing our own case at the same time and I know it was right around the time the case was going to begin.

Q Okay. And notedly from your investigation there were a number of witnesses at the playground on September 4, 2001, is that correct?

A When you say "a number of witnesses?"

Q There were approximately ten witnesses, is that correct?

A I don't know what the number is. I know who I spoke to and I know of the people that I knew. I mean, I'm sure you have a list. You can go over the names. I could probably say yes or no I knew about them, but there was probably somewhere in the neighborhood of eight, ten, twelve, something like that.

Q Thank you. I have nothing further.

THE COURT: Mr. Benson.

REDIRECT EXAMINATION

BY MR. BENSON:

Q Mr. Solano, you didn't give a witness list over before the trial? You didn't give a witness list over to the defense counsel?

A I did not.

Q It's ordinarily done at the time of trial?
A Correct.
Q And -- but you have investigators who can work for you to look for information?
A Yes.
Q And you're aware of defense lawyers having investigators that can work for them and look for information?
MS. RICHMAN: Objection, your Honor.
THE COURT: Overruled.
A I'm aware of that, yes.
Q Do you have personal knowledge of any investigation done by Mr. Warren or people helping Mr. Warren about finding out who the witnesses were?
A Well, I actually do because of a conversation at one of the court proceedings that we had when Mr. Warren specifically asked me if he could get the names of the witnesses so he could have his investigator go out and speak to them. And at that point I told him that I would try to get in touch with the witnesses first before giving the names over. And the only reason that I did that was because Mr. Warren assured me and assured the Court that he would not be turning those names over to his client, that it was only for him to have an ability to go speak to the witnesses.

Q Did you end up turning the names over to him or no?

A No.

Q Did the witnesses ask you not to turn their names over?

A Yes.

Q And as far as Ms. Richman asking you about witnesses being reluctant to testify -- withdrawn.

MR. BENSON: I have no further questions.

Judge, I'm sorry. One other thing.

Q About the number of witnesses that were there, I guess we're going to have to introduce some more nicknames. The name K, do you know who that referred to?

A Yes.

Q Who was that?

A It was Bobby Gibson. I believe his middle name was K.

Q How about Slay?

A Corey Brown.

Q His nickname was Slay?

A Yes.

Q Mookie, when they say the name Mookie?

A Mookie, it's either Naia Hardison or Latisha Smith.

Q Is Mookie a nickname for one of the girls?

A Yes.

MS. RICHMAN: One other question.

RECROSS EXAMINATION

BY MS. RICHMAN:

Q In your investigation you obviously learned the interaction between the different witnesses?

A When you say inter --

Q For instance, Tyleek is Shaquanna Edmonds' brother?

A I believe.

Q And Tyleek Edmonds is the baby father to one of the other girl's baby?

A I don't know.

Q And you noted that these girls go back a long way, correct, they're a click?

A Click? I know there was a relationship. They were three friends. I don't know how far back they went.

Q But the three of the girls were very close?

A Again, I can't say very close. I know that they knew each other and they were friends.

Q And they also stated to you they knew Corey McCollough for a long time?

A Again, I don't know how long. Maybe there's something in the paperwork that can refresh my recollection, but I don't know how long they said the relationship was or

even how they knew him. But I know they said they knew who Corey McCollough was.

Q Again, they said they had grown up with him, is that correct?

A I can't recall.

THE COURT: Anything else?

MR. BENSON: Nothing else right now. I think we need a break to arrange something with counsel before we call the next witness.

THE COURT: All right, Mr. Solano, you may step down.

(At this time, the witness exited the courtroom.)

THE COURT: We're going to take a very brief recess. You may return to your jury room. Please remember not to discuss the case. We'll be calling you shortly.

(At this time, the jury exited the courtroom.)

THE COURT: Are you just going through some discovery, is that what the problem is?

MS. RICHMAN: One of the problems, your Honor, is that when I received the relocation package many people were assigned numbers but I was never given a key to the numbers. So I can't determine what goes

with what which obviously will impact my ability to cross. So that's the difficulty.

MR. BENSON: This is the situation. The different witnesses had different relocation packets that I'm giving to her. I'm letting her know what pages pertain to the witnesses. The thing about the custody numbers is I think the custody numbers don't relate specifically to the person. They would, but they also relate to every time somebody goes into a new hotel. So the same witness may have a few custody numbers. It's not real important to the prosecution that she know what benefit a witness got, whether she considers the witnesses friends.

THE COURT: She meaning Ms. Richman?

MR. BENSON: If Ms. Richman attributes to a witness on the stand a benefit that a family member got because it's in the same package. We're not going to take issue with that. In other words, in front of custody the witness will probably clarify money went to more than one person. But by each package she can get a sense of the expenditures, not just a sense of --

THE COURT: How long will it take you?

MR. BENSON: About five minutes.

THE COURT: All right, we'll have a very short break then.

(At this time, there was a short break in the proceedings and the matter subsequently resumed.)

COURT CLERK: Case on trial continues. All parties are present in the courtroom.

MS. RICHMAN: Your Honor --

THE COURT: I think we can start the jury up.

MS. RICHMAN: Yes, absolutely.

Your Honor, I may ask for a break between cross so I can go through the pages just to check on the numbers to make sure that my inquiry is proper.

THE COURT: Come up a minute, please, while we're waiting for the jury.

(At this time, a bench conference was held off the record.)

COURT OFFICER: Ready for the jury, your Honor?

THE COURT: Yes, we are.

(At this time, the jury entered the courtroom.)

COURT CLERK: Will the attorneys stipulate that the jury is present and properly seated and waive the reading of the roll call?

MS. RICHMAN: Yes, I do.

MR. BENSON: Yes.

THE COURT: Ready to proceed Mr. Benson?

MR. BENSON: Yes.

The People call Shaquanna Edmonds.

(At this time, the witness entered the courtroom.)

COURT CLERK: Please raise your right hand.

Do you solemnly swear or affirm that the testimony you are about to give shall be the truth, the whole truth, and nothing but the truth so help you God?

MS. EDMONDS: Yeah.

COURT CLERK: Thank you. Please be seated.

Now, for the record in a loud voice could I have your name, please.

MS. EDMONDS: Shaquanna Edmonds.

COURT CLERK: Would you spell both names, please?

MS. EDMONDS: S-H-A-Q-U-A-N-N-A E-D-M-O-N-D-S.

COURT CLERK: Which borough do you reside in?

MS. EDMONDS: Bedstuy.

MR. BENSON: Your Honor, I ask that she refrain from stating where she is.

COURT CLERK: Which borough?

MS. EDMONDS: Queens.

S H A Q U A N N A E D M O N D S, having been duly sworn, testified as follows:

DIRECT EXAMINATION.

BY MR. BENSON:

Q Ms. Edmonds, how old are you?

A 20.

Q I'd like to direct your attention back to September of 2001. Before any of this started, where were you living at that time?

A [redacted].

MS. RICHMAN: I'm sorry?

THE WITNESS: [redacted].

MS. RICHMAN: Thank you.

Q Was that in the Bedstuy neighborhood in Brooklyn?

A Yeah.

Q Who did you live with at that time?

A My mother.

Q And how many siblings do you have?

A Seven.

Q So there are eight of you altogether?

A Yeah.

Q And what type of housing situation did you have?

A Section 8.

Q Okay. Do you know a person named Naia Hardison?

A Yeah.

Q Does she have a nickname?

A Yeah.

Q What is it?
A Squeaky.
Q Why is that?
A Because her voice is squeaky.
Q Do you know a person named Latisha Smith?
A Yeah.
Q Does she have a nickname?
A [redacted]
Q What's that?
A Mookie. [redacted]
Q So Latisha is Mookie?
A Yes.
Q Do you have a nickname?
A Quan.
Q All right.
Now, I'd like to direct your attention to September 4, 2001, in the evening. Do you remember something unusual happening at that time?
A What you say?
Q September 4th of 2001 at night, do you remember something happening?
A Yeah.
Q Can you tell the members of the jury what you remember, and try to keep your voice up. Tell them what happened that you remember about September 4th?

A On September 4th Dennis Brown got killed by Wesley Snipes.
Q What was Dennis Brown's nickname?
A Dough Boy.
Q Did he have a brother?
A Yeah, Corey Brown, Slay.
Q Cory's nickname was Slay?
A (Head gesture.)
Q Where was it that this happened?
A In the park.
Q And can you tell the members of the jury who you recall being in the park when that happened?
A It was a lot of us, a whole lot of us in the park.
MS. RICHMAN: I'm sorry?
THE COURT: Read back the response, please.
THE WITNESS: It was a whole lot of us in the park, guys and girls.
Q Can you tell us the names of some of the people who were there?
A Yeah. Corey, Dough Boy, me, my brother, Naia, Mystie and Latisha, Freddie and the kids.
Q And who?
A The kids.
Q Was a guy named K there?
A Yeah, Kareem.

Q What's his name?
A Kareem, Bobby Gibson.
Q Was Corey Brown there? That's Slay.
A Yes.
Q And you said that a guy named Wesley Snipes, Sykes shot Cory's brother. Did you know his name at the time he shot Cory's brother? Did you know his name at the time?
A No. Never heard of him until this happened.
Q Was he with anybody when it happened?
A Yeah, Corey McCollough.
Q Did Corey McCollough have a gun?
A No.
Q Did Wesley, his name is Wesley Sykes, did he have a gun?
A Yeah.
Q Was there any distinctive feature about him? If you didn't know his name, was there any distinctive feature that you know about him at that time that you would use to describe him?
A Who? Corey McCollough?
Q No, the one who did the shooting?
A His eye. He was black with a messed up eye.
Q When you say dark?
A Dark skin.
Q With a messed up eye?

A Uh huh.

Q Do you remember the day that Dennis Brown ended up dying of his wounds?

A Yeah.

Q What day was that?

A September 27th.

Q Is that your recollection?

A Yeah.

Q And then do you remember sometime in October that a person was arrested for this case?

A Yeah, Wesley Snipes.

Q Did you go to the precinct?

A Yeah.

Q Did you talk to Detective Bond and tell him who did the shooting?

A Yeah.

Q Who did you tell, when you talked to Detective Bond who did you say did the shooting?

A Wesley Snipes.

Q Did you do it by name or describing what it looked like?

A I described what he looked like.

Q Then did you go to a lineup?

A Yeah.

Q Did you identify him in the lineup?

A Yes.
Q And was that -- withdrawn.
Now, once the case begin, once there were charges, did you then learn the person's name?
A Uh huh.
Q Were you aware that you might have to be a witness at a trial in future months?
A No, I didn't think it would have to go this far but it did.
Q Did you know that you had made statements to the police?
A Uh huh.
Q And to the district attorney?
A Uh huh.
Q Do you remember that?
A Yeah.
Q Did you make a sworn statement to Javier Solano?
A Yeah.
Q Did they make you testify in the Grand Jury?
A Yeah.
Q Do you remember going to the Grand Jury or just to Javier Solano?
A Javier Solano. I don't think I went to no Grand Jury for Snipes.
Q And then the months went by. Were you aware there

was going to be a trial eventually for Wesley Sykes?

A No.

Q Did anybody -- I'd like to direct your attention to May or June, late May or June of 2002 in the summer. Withdrawn.

When all this first happened, did you know a person named Turf or Dupree Harris?

A No.

Q In late May of 2002, did you meet a person named Dupree Harris?

A Yes.

Q What's his nickname?

A Turf.

Q I ask that you look around the courtroom and indicate whether he's present today?

A Yeah.

Q You have to say something to describe him?

A Huh?

Q You have to describe him somehow?

A He heavyset. He had braids, but he don't have braids now.

MR. BENSON: Your Honor, I ask that the record reflect the identification.

MS. RICHMAN: No objection.

THE COURT: All right, it is noted.

Q Tell the members of the jury your recollection of -- withdrawn.

Before you met Dupree Harris, had you heard of him? Had anybody told you about him?

A Yeah. They said he was real dangerous.

MS. RICHMAN: Objection, your Honor.

Q Tell the members of the jury who spoke to you specifically.

THE COURT: All right. Overruled.

Q Who spoke to you about him in particular?

A This guy named Mystie.

Q Mystie?

A Yeah.

Q Is that a nickname?

A Yeah. I don't know his name.

Q Did anybody else talk to you about Dupree Harris?

A The streets, the rumors.

Q Do you know a person named Aaron Young?

A Yes.

Q What is his nickname?

A Bat.

Q Did Bat ever tell you about Dupree Harris?

A No, he just brung him up to us.

Q He just brought him up to you?

A Yes.

Q What did Mystie tell you about Dupree Harris?
A He said "He want to talk to ya'll. Do what he say because I seen him violate a lot of females."
Q You got to repeat that.
A He said talk to him because he's mad about his brother and he's like, he's a very dangerous person and I don't want to see nothing happen to you.
Q So Mystie told you to talk to Turf because he didn't want to see anything happen to you all?
A (Head gesture.)
Q How did you react when he said that?
A I was scared.
Q Did you talk with anybody about it?
A No, but the other witnesses.
Q Okay, did there come a time when you actually met a person named, when you met the defendant?
A Yeah.
Q Do you remember exactly when that was?
A It was one night, a night, it was me and my home girl was walking up the block.
Q You got to keep your voice up.
A It was the night I was walking up the block.
Q Do you remember what month that was?
A I think June.
Q Of 2002?

A Uh huh.

Q Okay, and what, tell the members of the jury what street you were on and your recollection of how you met him.

A I was on Hart Street with Naia Hardison and another friend, Poo. And Aaron Young called Poo and told him to tell Quan and Naia to call me, and that's when we met Turf.

Q You were with Naia and somebody named Poo?

A Poo.

Q And Aaron Young was with who?

A This other boy with the dreads and Turf.

Q Aaron Young was with Turf and somebody else who had dreads?

A (Head gesture.)

Q And Aaron Young is Bat?

A Yeah.

Q Who did Aaron Young call out to?

A He just told us to talk to him.

MS. RICHMAN: I'm sorry?

THE WITNESS: He told us to talk to him.

Q Aaron Young told you to talk to him?

A Uh huh.

Q Was it light out? Was it dark out?

A Dark.

Q Were they, were these three people, Aaron Young,

Turf and the person with the dreads, were they in a car or were they in the street?

A They was walking.

Q They were walking?

A (Head gesture.)

Q When you were asked to go talk to him, did you do it?

A Yeah.

Q And why did you do it?

A Because he said talk to the boy. So I talked to the man.

Q And what happened?

A Nothing. We was talking to him and he was like "I know you probably heard a lot of bad things --"

Q You got to go slow. Say it again. What happened?

A We were talking to him. "I was like T as in Turf?" He said "Yeah. I know you heard a lot of bad things about me. I'm not that bad how people make me seem to be."

Q In other words, he introduced himself and you said "Are you T as in Turf?" He introduced himself as T?

A Yeah.

Q He said "I'm not that bad as in what people say about me?"

A Uh huh.

Q Then what happened?

A Then he just told us to call him. That was that.
Q Did he give you a number to call him at?
A Yeah.
Q Did you call him as he told you to?
A No, I didn't call him that first night.
Q What happened after that?
A The next day he came over and asked us why we didn't call him, and I told him because I didn't have no money, and he gave me a calling card.
Q The first thing Turf gave you was a calling card?
A Yeah.
Q What was that for, just local calls?
A Yeah, to call him.
Q And he gave you a number to call him at?
A Uh huh.
Q And what happened that second day? Other than him giving you a calling card, was there anything else?
A No.
Q After that did you call him?
A Yeah.
Q And how often did you call him?
A We spoke to Turf a lot.
Q And how often did he call you?
A I ain't have a phone so basically he didn't call me.

Q Did you know when you saw him -- where did you see him?

A On [redacted] Street.

Q He would come over to the neighborhood where you lived?

A Yeah.

Q Did you ever know where he lived?

A No.

Q Did he ever tell you where to find him?

A No.

Q Did you ever know any of his addresses?

A (Negative head gesture.)

Q Did he ever give you anything besides a calling card?

A Yeah.

Q What did he give you?

A Money.

Q How often did he give you money?

A Three times.

Q And how much money did he give you?

A All together it was 700.

Q You say three times. The first time how much money did he give you?

A First time he gave me $100 because I had to go take care of some business. The second time he gave me

another $100 to get my hair done. The third time he gave me $500 when we left Warren's office.

Q Oth[redacted]an the times that he gave you money, specifically the $100 and the $100 and then $500, did he ever buy you things or --

A Yeah. He was very nice to us. He didn't seem like he was gonna hurt us at all.

Q What type of things did he do?

A We went out to eat, to restaurants, stuff like that. He didn't make it seem like he was gonna do anything to us, because to get technical, if he wanted to he had a chance to.

Q In other words, he was with you but he didn't harm you?

A No.

Q Did he take you and buy you food?

A Yeah.

Q Did he give you things like that?

A Uh huh.

Q Did he ever say -- did you ever hear him say anything threatening to you?

A No.

Q Did you ever see him with a weapon?

A No.

Q Did you ever see a gun that he had?

A No.
Q Okay.
MS. RICHMAN: Objection to the implication by the prosecution.
THE COURT: Sustained to the form of the question.
Q Did you ever see him with a gun?
A No.
Q Did you know of him to have a gun?
A Nope.
Q You said there was a time when you went with him to Mr. Warren's office?
A Uh huh.
Q Do you remember the exact date?
A No, I don't remember the exact date.
Q Can you tell the members of the jury how it is that you ended up going to Mr. Warren's office?
A He took us to the office.
Q Did he take you with other people or you alone?
A Yeah, me, it was me and Latisha and his friend.
Q But the day that you went, were you alone or with somebody else?
A With his friend and Latisha.
Q Do you remember Latisha being there?
A Yeah.

Q Did you make a statement to Mr. Warren?
A Yes.
Q And who was there when you made the statement?
A Just me, Mr. Warren and Turf.
Q And do you remember was that at Mr. Warren's office?
A Yeah.
Q What was told to you when you went to Mr. Warren's office?
A To say that Corey McCollough did it.
Q Who told you that?
A Turf.
Q And where did he tell you this?
A When we was walking to his office.
Q Well, first of all, do you remember where Mr. Warren's office is?
A No.
Q How did you get there?
A By car.
Q Who drove?
A Dupree.
Q That's Turf, the defendant?
A Yeah.
Q Did he tell you where you were going when you first got in the car?

A I knew where I was going.

Q And where was that?

A To the office.

Q And how did you know where you were going?

A Because the other witness told me where we was going.

Q That's Latisha?

A (Head gesture.)

Q Had she already been to Mr. Warren's office?

A I guess. I'm not sure about all of that.

Q Are you sure she was with you in the car that day?

A Yes, she was with me.

MS. RICHMAN: Objection, your Honor. Asked and answered.

THE COURT: Sustained.

Q Now, when you got to the -- you said you were walking to the office and Turf told you something?

A Yeah.

Q What did he tell you?

A To say Corey McCollough did it.

Q Did he say why?

A I guess he was trying to help his brother, what anybody would do, try to help their sibling.

Q Did he tell you what to say other than Corey McCollough did it?

A No. He just said Corey McCollough did it. That was it.

Q Did he tell you to give a reason for why it happened?

A No. Yeah, because it was over the Bloods.

Q He told you what?

A Say because, it was because of the Bloods, it was a Bloods thing.

Q Did he tell you whether he had knowledge of whether his brother actually did the shooting?

MS. RICHMAN: Objection.

A We never really talked about it.

THE COURT: Overruled. You may answer.

A We never really talked about that.

Q So he didn't tell you who did the shooting?

A Who? Turf?

Q Yeah.

A No, he knew who did the shooting.

THE COURT: Excuse me, counsel.

I'm sorry. Go ahead.

Q What was your answer?

A What you say?

Q What was your answer about Turf talking to you about who did the shooting?

A He knew who did the shooting but he was trying to

take up for his brother.

MS. RICHMAN: Objection, your Honor.

THE COURT: Overruled.

Q How do you know that he knew his brother did the shooting?

A I guess because his brother was about to go -- he was in jail for it.

Q And he told you to say that somebody else did it?

A (Head gesture.)

Q Now, you're aware that you had already made numerous statements saying that Turf's brother had done it, is that correct?

A Uh huh, yes.

Q Did you talk to Turf about whether that would be a problem?

A I told him he should let us get ourselves out of this, but he said he was gonna handle all that, so.

Q He said what?

A He said he was gonna handle all that. I told him let us get ourselves out of it. He said he was gonna handle it, don't worry about that.

Q Turf told you not to bother about it, that he was going to what?

MS. RICHMAN: Objection.

THE COURT: Overruled.

A Take care of it.
Q Take care of it?
A Yes.
Q Did he explain to you what that meant?
A No.
Q He just said not to worry about it?
A Yes.
Q Did you go to Mr. Warren's office and did you make a statement to Mr. Warren?
A Yeah, yeah.
MR. BENSON: Your Honor, I have an item that I'd like deemed People's Exhibit number 5 for identification and shown to the witness.
THE COURT: Okay.
MS. RICHMAN: No, objection.
Q Now, did you have a chance to listen to that tape before you came into court?
A Yeah.
Q Did you put your initials on it?
A Uh huh.
Q Is that an accurate recording of the conversation that you had with Mr. Warren at his office?
A Uh huh.
MR. BENSON: Okay, I'd ask that this be admitted in evidence as People's Exhibit number 5 and

played for the jury.

MS. RICHMAN: No objection.

THE COURT: It is admitted and you may play it.

THE WITNESS: Who?

THE COURT: The officer.

(At this time, People's Exhibit number 5 being played.)

Q Ms. Edmonds, is that an accurate recording of the conversations that you had with Mr. Warren?

A Yes.

Q Did you understand that Mr. Warren was the defendant's brother's lawyer?

A Uh huh, yeah.

Q Now, on the tape Mr. Warren introduced himself. We heard his voice. Did you hear it?

A Uh huh.

Q And you heard your voice?

A Uh huh.

Q He didn't introduce anybody else with you; you were the only two people sitting there when that tape was made?

A No.

Q Who else was there?

A Turf.

Q The whole time you were speaking Mr. Warren had Turf sitting there?

A (Head gesture.)

THE COURT: Was there an answer?

Q You have to answer out loud. Was Turf sitting right here?

A Yeah.

Q How close?

A He was like this distance, me and this lady right here.

Q Meaning the reporter?

A Yeah.

Q About four feet?

A Yeah.

Q Now, do you remember in the statement you said that you didn't see the other boys face, the boy that was with Corey McCollough?

A Yeah.

Q Do you remember saying in the statement that he had a messed up eye?

A Uh huh.

Q How could both of those things be true?

MS. RICHMAN: Objection.

THE COURT: Sustained.

Q Was the statement that you made to Mr. Warren

true?

A No.

Q Why did you say, why did you make that statement up?

A Because Dupree told us to go down there and say Corey McCollough did it.

Q Say what?

A That Corey McCollough did it.

Q Who told you?

A Dupree.

Q Why did you do what Dupree said?

A Because I don't know what the repercussions would be if I didn't do it.

Q Is that because you heard about things you had heard about him?

A Yeah.

Q Is that because you took money from him?

A Yeah.

Q After you spoke to Mr. Warren, did you leave his office?

A Uh huh.

Q Can you tell the members of the jury what happened after you left the office?

A We got in the car, and Turf, after we got where we was going to our destination and he gave me $500.

Q Did he say anything about what you had said to Mr. Warren?
A He said "You did good."
Q Told you you did good?
A Yeah.
Q Every time he gave you money was that in Brooklyn?
A Yeah.
Q And when he would buy you food or give you things, was that in Brooklyn?
A Uh huh.
Q And was that all in or about June of 2002?
A Yes.
Q Now, one thing. I want to ask you about the tape. Mr. Warren asked you if you had contacted A.D.A. Solano and expressed reluctance about testifying. Was that part true?
A Yeah.
Q And had you called Solano to tell him you didn't want to testify?
A No, I went into his office and told him.
Q And did you tell him why you were reluctant to testify?
A No, I just told him I didn't want to have nothing to do with the case.
Q Had you met Turf by then?
A Yeah.

Q So you didn't let Mr. Solano know?
A No, because Turf ain't know I went to the office either.
Q You didn't tell Turf you went to the office and you didn't tell Solano --
A That Turf --
Q You didn't tell him Turf had come into your life this month before the trial was supposed to begin?
A No.
Q You just said I don't want to have anything to do with the case?
A Yep.
Q Now, you said this statement was not true. What you said to Detective Bond, what you said to Detective Mosely at the lineup, and what you said to Javier Solano, was that true?
A Uh huh.
Q Who was the person who actually shot Dough Boy?
A Wesley Snipes.
Q Turf's brother?
A Yeah.
Q At the trial itself in July of 2002, did you testify?
A Yeah.
Q Who did you testify did the shooting at that

trial?

A Snipes.

Q So you said at that trial, you said the person with the messed up eye, Snipes or Sykes did the shooting?

A Yeah.

Q Is the only time that you say that you made a statement about Corey McCollough was at Mr. Warren's office with Dupree Harris present?

A Yes.

Q Now, by July, by the time of the trial you were then once again cooperative with the police and the district attorneys office?

A Yeah.

Q Did something happen between the time that you made the statement to Mr. Warren and the time of the trial to change your attitude about this?

A Yeah. Bobby Gibson was killed.

Q I'd like to direct your attention to the early morning of Saturday, June 29, 2002. Do you remember that occurrence?

A Yeah. I woke up out my sleep, I heard gunshots and I looked out my kitchen window and saw K laying there.

Q Did you actually see the shooting?

A No.

Q When you say K, that's Bobby Kareem Gibson?

A Yeah.

Q Did you know that he was a witness to this as well?

A Yeah.

Q Did you know that he was scheduled to testify just like you?

A Yes.

MS. RICHMAN: Objection, your Honor.

THE COURT: Overruled.

Q Did you go outside after you heard the shots?

A Yeah, after the cops came.

Q Did you see Bobby Gibson?

A Yeah.

Q How close did you get to him?

A Close enough.

Q And was he -- at that time he had already been shot?

A Yeah.

Q How did you feel when you saw that?

A I said "What's next? I guess I'm next."

Q That was your state of mind?

A Yep.

Q Now, did the police come to you the first Saturday to find out if you were okay?

A Yeah.

Q And did you admit to them then what had happened with Dupree when they first met you?
A No.
Q Were you worried? What were you worried about?
A My life. I didn't know what was next. Like I don't know what's gonna be the consequences about this right here.
Q Did you end up -- the next day did the police come back to talk to you again?
A Yeah.
Q And now talking about Sunday, June 30th, did you then explain to them, and you can't say everything you told the police, but did you explain to them the things you had held back before?
A Yeah.
Q And did they take you down to the D.A.s office to meet with Steve Murphy?
A Uh huh.
Q Did you know that he was then the district attorney prosecuting the case against Wesley Sykes?
A Yeah.
Q And you made a statement to him then?
A Who Murphy?
Q Yes.
A Yes.

Q And thereafter you ended up testifying at the trial?

A Yeah.

Q And thereafter did you have to testify in a Grand Jury proceeding with respect to the defendant Dupree Harris?

A Yeah.

Q About the things that had been given to you?

A Yeah.

Q Starting with that day, June 30th of 2002, after you told the police and the district attorney everything, did your life and your living situation change?

A They moved me out of 276, they put me up in a hotel.

Q And did you ever go back to your house since then?

A No.

Q How long did you stay in a hotel?

A Seven months.

Q And was it arranged for you to get some type of housing after that?

A Yeah.

Q And what type of housing did you get? You don't have to say the address.

A Projects.

Q And what about for you to cover your expenses, how would you sustain yourself when you moved in?

A I was on public assistance.

Q So that was what relocation amounted to?

A Uh huh.

Q Now, when you were in the hotel, were other family members brought to the hotel with you?

A Yeah, the first time until ya'll kicked them out.

Q Well, if that's how you feel about it, that's how you feel about it. But how long did your family stay with you?

A Like three weeks, a month the longest.

Q Okay, you were the witness, and was there another family member that was a witness?

A Oh, yeah.

Q Who was that?

A My brother.

Q And what's his name?

A Tyleek.

Q Did he also testify at the trial?

A In the Wesley, yeah.

Q You mean at the Wesley Sykes trial?

A Yeah.

Q Was your brother put in a hotel for a while?

A No, he was incarcerated.

Q He got arrested for his own separate incident?

A Yeah.

Q So did you understand that when it came to relocation you were the only one and it was only you who would be put into housing?

MS. RICHMAN: Objection.

A Yeah.

THE COURT: Sustained to the form.

Q Did you have a problem with the way you were relocated?

A Yeah.

Q Has this been a easy period of time for you?

A No.

Q Were you ever moved from one hotel to another?

A Several times.

Q Did you remain in the same project that you were initially moved to?

A Yeah, until now.

Q And have you been moved out of that project?

A Yeah.

Q And you've been living in a hotel?

A Uh huh.

Q Right now you're in advanced stages of pregnancy?

A Yeah.

Q I know, and what is your due date?

A The 31st.

Q Of this month?

A (Head gesture.)

Q Has this been a easy or difficult process for you?

MS. RICHMAN: Objection, your Honor.

A Worse.

THE COURT: Overruled.

Q Have you received money for food?

A Yeah.

Q Have you received -- the district attorney's office paid expenses for your housing?

A For the projects?

Q Well, for hotels you stayed in.

A Oh, yeah.

Q And is that why you're testifying because you received that housing and that food money?

A No. If I could turn back the hands of time I'd be back at [redacted]. This is not the life of luxury at all.

MR. BENSON: Your Honor, I have nothing further for this witness.

THE COURT: All right, counsel, you want to begin your cross.

MS. RICHMAN: Sure.

CROSS EXAMINATION

BY MS. RICHMAN:

Q Good afternoon Ms. Edmonds.

A How you doing.

Q When Mr. Harris met you, he introduced himself, is that correct?

A Yes.

Q And he told you he was Wesley Sykes' half brother, correct?

A Yeah. I been knew he was his half brother.

Q I'm sorry?

A I been knew he was his half brother.

Q And he told you, correct?

A Uh huh.

Q And he told you what his name was, correct?

A Uh huh.

Q And when is the very first time that you met with him?

A [redacted] Street. I don't really remember the date.

Q If I give you a calendar, would that help you?

A Nope.

Q You don't know what day it was on Hart Street?

A No.

Q What month was it?

A June, July.

Q Was it the beginning of June?

A I don't know, miss. It was in June.

Q Just in June. And when is the next time you met him?

A After that, the next day.

Q And exactly, if you can just think for a minute, how many times do you say you met him?

A Say about five. I don't know. I wasn't keeping count.

Q About five times. And when is the first time you say Mr. Harris gave you $100?

A When we was on [redacted]

Q When was that?

A I don't remember the day. A couple of days after that, after I met him.

Q Sorry?

A It was a couple of days after I met him.

Q And you said you had to take care of some business. What business was that?

A Getting an abortion.

Q And what day did you get the abortion?

A July something. July 6th or something.

Q July 6th. And when was the next time that you saw Mr. Harris?

A Well, he would just come by to chill, to say what up or whatever.

Q And when is the first time that you claim that

Mr. Harris discussed his brother's case with you?

A We didn't really even talk about that. We talked about that when time came, when it was time to go to the lawyer's office.

Q Before that he never introduced the discussion with you whatsoever?

A No.

Q Now, you say that when you went to Mr. Warren's office you went in Mr. Harris' car, is that correct?

A Uh huh.

Q And you say that you went with just him, is that correct?

A Uh huh.

Q Just with him?

A Uh huh.

Q And Latisha wasn't there at that time?

A Yeah, Latisha was there and some boy with a big head.

Q Some boy with a big head?

A Uh huh.

Q And where did, where did you meet Mr. Harris to go down to this lawyer's office?

A He picked us up from Latisha house.

Q And did you testify at a prior proceeding?

A Huh?

Q You testified with relation to Mr. Sykes' case and Mr. Harris' case in relation to the Grand Jury, correct?
A Yes.
Q And were you asked this question --
MS. RICHMAN: And Mr. Benson, I refer you to I believe the Grand Jury minutes at page 25.
MR. BENSON: From which proceedings?
MS. RICHMAN: I believe it's, I don't know, from what you gave me.
Q Were you asked this question -- when you go to the Grand Jury, you're under oath, correct?
A Uh huh.
Q And you're sworn to tell the truth?
A Uh huh.
Q And you have to think because it's important to get the correct answer, correct?
A Yeah.
Q So were you asked this question and did you give this answer:
"When you got to the office, were you with this person Turf by yourself or were there other people?"
A Oh, yeah, I --
Q Your answer "Other people.
"QUESTION: Who was the other person? Did you know this person?

"No, some of his friends."

Was that incorrect?

A Yeah, that's the big head boy.

Q And did you mention Latisha at that time?

A No.

Q And I also refer you, when Mr. Harris you say picked you up, you say he took you in his car, is that correct?

A Uh huh.

Q And that was a regular car, correct?

A Yeah.

Q Now, I refer to your testimony in the July of '02, were you asked this question and did you give these answers:

"QUESTION: How did you come about going to Mr. Warren's office?

Your answer: Turf came and picked me up and took me there.

"QUESTION: When you say he took you there, did you guys take a cab, a train, a van, who's car?

Your answer: A mini van, I guess it's his."

Were you asked those questions and did you give those answers?

A Yeah.

Q Now, during your interview with Mr. Warren, Turf wasn't doing anything when you were sitting there, is that

correct?

A No, he was just looking at me.

Q He was totally calm, correct?

A Uh huh.

Q No problems, no issues, correct?

A Right.

Q During Mr. Sykes' trial were you asked this question and did you give this answer, "What was he doing -- I'm sorry.

A Oh, yeah, he was shaking his head.

Q Were you asked this question and did you give this answer:

"QUESTION: What was he doing during the course of this interview?"

Your answer: "Shaking his head up and down like this, indicating."

"QUESTION: Shaking his head up and down?

"Uh huh.

"When was we doing that?

"When he was taping me, Mr. Warren, the lawyer."

Did you give those answers at that time?

A Uh huh.

Q At that time?

A Uh huh.

Q But he wasn't doing that at all, was he?

A Yeah, he was.
Q Now that's your testimony?
A Yeah.
Q Now, you had communicated a number of times since -- well, the first time that you went and met Ms. Mosely, she came and picked you up, is that correct?
A Uh huh.
Q And you didn't come down to volunteer to meet with her, did you?
A No, she came to us.
Q And Dennis Brown had been shot in September 4th of 2001, correct?
A Uh huh.
Q And at no time did you go down and say "Hey, I have some information on the shooting," is that correct?
A Right.
Q In fact they had to come and get you?
A Right.
Q Correct. And you had spoken with a number of district attorneys with regard to this matter, correct?
A Yeah.
Q And you'd given a number of statements, correct?
A Right.
Q And you stated that all of the things that you said in your statement to Mr. Warren were false, is that

correct?

A Right.

Q But in fact, much, if not all of that statement was true, is that correct?

A No. Well, the majority of it was true but the shooting part, that's it. That was the only lie, and about the Bloods.

Q But the aspect of the Bloods, that wasn't true?

A No, because it wasn't over no Blood.

Q There was no Bloods?

A It was Blood, it was not over no Bloods.

Q Okay. Now, you were aware that Corey McCollough and Corey Brown had a beef, isn't that correct?

A I didn't know nothing about that until after everything happened.

MS. RICHMAN: If I may have a moment, your Honor.

Q Were you asked this question and did you give this answer, again during the Sykes trial, 7/17.

"QUESTION: And you knew, did you not, that Corey McCollough had a problem with Corey Brown, didn't you?"

Your answer: "Yes."

"QUESTION: And that was as a result of Corey Brown slapping Corey McCollough's girlfriend, is that correct?"

Your answer: "Uh huh, yes."

"QUESTION: And he also smacked her friend, is that correct?

Your answer: "Yes."

"QUESTION: And you knew about this, did you not?

Your answer: "Yes."

Did you give those answers? Were you asked those questions and did you give those answers?

A Yeah. I found out everything after the shooting had happened, yeah.

Q Well, question -- were you asked this question during that trial:

"QUESTION: And you knew about this, did you not?

And your answer at that time was "Yes."

Did you answer that question in that manner?

A Yeah.

Q Now, you gave a statement to Mr. Solano, is that correct?

A Yeah.

Q And do you recall seeing Mr. Sykes come back carrying a gun in one of his hands?

A What?

Q Did you recall Mr. Sykes riding a bike and carrying a gun in one of his hands?

A Yeah.

Q So he was holding it in his hand?

A Yeah.

Q Page 715, were you asked this question and did you give this answer:

"QUESTION: And you don't recall seeing Mr. Sykes come back carrying a gun on the bike in one of his hands by the side?"

Do you answer, "He had the gun on his waist. He was holding the gun by his waist."

"QUESTION: By his waist as he was riding the bike?

"ANSWER: Yes. You can ride a bike and hold a gun in your waist. It's possible."

Were you asked those questions and did you give those answers?

A Yeah.

Q Now, you knew that Corey Brown was a Blood, correct?

A Yes, I did.

Q And you knew that Corey McCollough was a Blood, correct?

A Corey McCollough was not a Blood.

Q Did you know that your brother was a Blood?

A Yeah.

Q And Dough Boy?

A Yeah.
Q And all the guys who were out there that night, correct?
A Uh huh.
Q And Freddie was out there?
A Uh huh.
Q And Angel was out there?
A Uh huh.
Q And there were about 12 people, correct?
A Uh huh.
Q And about how long were you in the park before you saw Corey Brown and Corey McCollough in the park at the same time?
A Like 45 minutes.
Q And how long did you know Corey McCollough?
A We grew up together.
Q So you knew him for a real long time?
A (Head gesture.)
Q Now. Now, everybody was just hanging out in the park like a regular summer evening, correct?
A Uh huh.
Q So everyone was drinking and smoking, correct?
A Uh huh.
Q And people were smoking pot, correct?
A Uh huh.

MS. RICHMAN: Your Honor, if I may just have a moment.

Q Now, Dennis Brown, at the time he was, he was on a, on his bike when he was shot, correct?

A Uh huh.

Q I'm sorry?

A Yes.

Q And Dennis Brown you say was just on a bike just like Wesley was, is that correct?

A Uh huh.

Q And just like Corey McCollough was, is that correct?

A Uh huh.

Q Now, in your testimony you referred to somebody named Mystery?

A What?

MR. BENSON: Mystie.

Q Mystie, I'm sorry. But you never mentioned Mystie to any of the authorities before, did you?

A No.

Q And so when you met, when you first met Mr. Harris on Hart Street, you just went to talk to him, is that correct?

A Say that again?

Q When you say you first met Mr. Harris on Hart

Street in June, you just went to talk to him?

A He just wanted to talk to us.

Q You just went to talk to him, is that correct?

A Talk to who?

Q Mr. Harris.

A Yeah, they said talk to him.

Q So you had no problem with that?

A No.

Q And who was it that said you should talk to him?

A Aaron Young.

Q And you actually grew up with Aaron Young, is that correct?

A Yeah. I knew him since for the times I was living on 276.

Q And how long were you living there?

A Ten years.

MS. RICHMAN: Your Honor, if you'd like me to break now, that's fine.

THE COURT: All right, perhaps this is a good time.

Jurors, we're going to take our lunch break now. I'm going to ask that you be back in your jury room at 2:20 please, and I remind you again not to have contact with anybody or discuss the case. Have a good lunch. See you at 2:20.

(At this time, the jury exited the courtroom.)

THE COURT: Okay, Ms. Edmonds, you're in the midst of your examination on cross examination, and you may not discuss your testimony with anybody else. Do you understand that?

THE WITNESS: Yeah.

THE COURT: Over your lunch break you may not discuss what you testified to the district attorney or with anyone else, all right, and we'll see you back here at 2:20, please. You may go to lunch as well.

(At this time, the witness exited the courtroom.)

MR. BENSON: Judge, may we approach?

THE COURT: Yes.

(At this time, a bench conference was held off the record.)

(At this time, a lunch break was had and the matter subsequently resumed.)

A F T E R N O O N S E S S I O N

COURT CLERK: Case on trial continues. All parties present, defendant is present in the courtroom.

THE COURT: Counsel, could you come up here please for a minute, and the jury can begin their way to court.

(At this time, a bench conference was held off the record.)

(At this time, the witness enters the courtroom, resumes the stand.)

COURT OFFICER: Jury entering.

COURT CLERK: Will the attorneys stipulate that the jury is present and properly seated, waive the reading of the roll call?

MS. RICHMAN: Yes, thank you.

MR. BENSON: Yes.

COURT CLERK: Ms. Edmonds, I remind you you're still under oath.

THE COURT: You may proceed.

MS. RICHMAN: Thank you, you Honor.

CONTINUED CROSS EXAMINATION

BY MS. RICHMAN:

Q Ms. Edmonds, when we broke you had testified on September 4, 2001 when you were in the car, you were smoking marijuana, correct?

A Uh huh.

Q Sorry?

A Yes.

Q And you were drinking, correct?

A Uh huh.

Q Did you testify previously, were you asked this

question, did you give this answer, page 713 of the trial testimony, "You were drinking and smoking marijuana before they came up?

Your answer: "No."

Were you asked that question and did you give that answer?

A No, I said yes.

Q I'm sorry?

A I said yes we was smoking and drinking.

Q So when you testified previously you testified incorrectly, is that correct?

A When did I say no?

MS. RICHMAN: Counsel, I refer you to, you can give her the nature of the EBT trial of Wesley Sykes.

MR. BENSON: Page 713 testimony happened on July 9, 2002.

Q On July 9, 2002 were you asked this question and did you give this answer:

"QUESTION: You were drinking and smoking marijuana before they came up?

Your answer "No?"

A Yeah, because we were just about to start.

Q I'm sorry, your hand was in front of your face?

A We were just about to start smoking and drinking.

Q Okay, so you were smoking and drinking?

A What you think?

Q I'm asking you.

THE COURT: That a yes?

THE WITNESS: Yeah.

Q Thank you.

Now, you say that Wesley Sykes said to Dennis Brown "You violated my family," is that correct?

A Uh huh.

Q And in fact it was Corey McCollough that had an issue with Corey Brown, is that correct?

A Right.

Q Now, prior to today, in your testimony each time you were asked what Mr. Harris had given you you never testified that he had given you a phone card, is that correct?

A He gave me a phone card. I did tell them about that.

Q You didn't tell them?

A I did so.

Q You did. So when you were asked what happened at the first meeting and you said nothing, was that true or was that false?

A What?

THE COURT: Asked by whom, counsel?

Q When you first met Mr. Harris, nothing happened at that first meeting, is that correct?

A Which meeting?

Q He didn't give you anything when you first met him, is that correct?

A No.

MS. RICHMAN: Counsel, I refer you to page 699.

Q Now, you say that Mr. Harris gave you $700, correct?

A Yes.

Q And you say the first thing that happened was that he gave you $100 to help you with your abortion, is that correct?

A Uh huh.

Q Is that a yes?

A Yes.

Q And that happened, and that was the first money he ever gave you was the money for the abortion, is that correct?

A Yes.

Q And you said that happened at the end of June, is that correct?

A Yes.

Q In fact you thought it was July, is that correct?

A It was, yeah, yeah.

Q Because your abortion was July 6th, correct?

A Yeah, somewhere around there.

Q And you actually met with Mr. Warren on June 12th, is that correct?

A I wasn't keeping dates of all of this Miss. I don't want to remember none of this so I wasn't keeping dates.

Q So you don't remember when anything happened?

A I do remember what happened, and I told ya'll what happened. I'm not keeping dates, time and all of that.

Q Now, turning your attention back to -- you say that you never testified that you did not see Mr. Sykes shoot Mr. Brown, is that correct?

A Say that again?

Q You say that you have never said, other than in Mr. Warren's discussion with you, that you did not see Mr. Sykes shoot Mr. Brown?

A Uh huh.

Q You're saying that in fact you did see Mr. Sykes shoot Mr. Brown, correct?

A He shot him.

Q Well, did you --

A This boy on trial. What does Snipes have to do with this?

Q We'll get to that.

Did you testify that, were you asked this question and did you give this answer.

MS. RICHMAN: Counsel, page 695 during the Sykes' trial.

Q "Now, after you heard that first shot, what did you see the defendant do after that?

"ANSWER: He shot -- well, I didn't see him. After he shot the first time, I went running out the park."

Were you asked that question and did you give that answer?

A Yes.

Q So in fact you had testified that you didn't really see him, is that correct?

MR. BENSON: Objection to the question. It was after he fired the shot.

THE COURT: All right, sustained.

Q Now, you also testified that you saw Corey McCollough giving instructions to Wesley Sykes in the park that night, isn't that true?

A Giving instruction? What you mean by that?

Q About where to point the gun supposedly?

A No.

MS. RICHMAN: Sorry, just give me a moment, your Honor. This is a little bit out of order.

Q Page 694, were you asked this question, were you asked these questions and did you give these answers:

"QUESTION: What was Corey McCollough doing?

"ANSWER: He was just standing there looking like he was trying to give him some hints or something.

"QUESTION: Like what?

"He was trying to give hints.

"QUESTION: What do you mean by that?

"ANSWER: Because the boy, he was hesitating and he pointed the gun at Dough Boy, then he pointed the gun at Dough Boy, he pointed the gun at Slay, Corey Brown. That's when he pointed the gun back at Dough Boy."

Were you asked those questions and did you give those answers?

A Yeah, that's the truth.

Q In fact Mr. McCollough was involved, is that correct?

MR. BENSON: Objection to this.

THE COURT: Sustained.

A What you say?

THE COURT: Just wait for the question.

Q Now, but you had told the district attorney that Corey McCollough had nothing to do with the shooting, is that correct?

A Corey McCollough?

MR. BENSON: Objection.

THE COURT: Sustained, sustained.

A It's over Corey McCollough.

THE COURT: Don't answer when I sustain the objection. Just stop.

Q So in fact it was your recollection that Corey McCollough was telling Wesley Sykes who to shoot?

MR. BENSON: Objection. Withdrawn.

A Yeah, I guess so.

Q Now, Corey McCollough actually left the park with Wesley Sykes that night, is that correct?

A Uh huh.

Q I'm sorry?

A Yes.

Q That a yes?

A Yes.

Q And actually Corey McCollough got on the bike of Wesley Sykes that night, is that correct?

A No, Corey McCollough was on his own bike.

Q Now, you had told people prior to ever meeting Mr. Harris, you had told people that you did not want to be involved in the trial of Wesley Sykes, is that correct?

A Right.

Q And even before you met Mr. Harris, you had told the D.A. that a whole bunch of times, correct?

A Well, after I started hearing rumors, that's when I didn't want to have nothing to do with it.

Q And you say that the $500 you got from Mr. Harris, you got it after, the afternoon after you spoke to Mr. Warren, is that correct?

A Uh huh.

Q And you say you met Mr. Harris on [redacted] Street, correct?

A Right.

Q And nothing at all happened when you first met Mr. Harris, correct?

A No.

Q And you were with Naia, Naia and Poo, is that correct?

A Right.

Q And you were just walking in the neighborhood, correct?

A Who?

Q You, Naia and Poo?

A Uh huh.

Q And so nothing at all was exchanged in that first meeting, correct?

A Ungh ungh.

Q Were you asked this question and did you give this answer, Grand Jury testimony page 24 line 17 to 22:

"QUESTION: Now, tell us when you met this person Turf, tell us what happened?

"ANSWER: He came, he gave us some money, he took us out to eat, whatever. Then we went. A couple of days went by, we went to Warren's office and he gave us $500."

Were you asked that question and did you give that answer?

A Uh huh.

Q You didn't mention a phone card, correct?

A No.

Q And you didn't mention any $100, correct?

A That's a total of the $700.

Q Okay. Now, at one point didn't you tell Mr. Warren that both Coreys had pulled out guns?

A Naw.

Q It's not on the tape?

A Not that I recall.

Q Now, when you left Mr. Warren's office, did you ever claim that Mr. Harris gave Mr. Warren a high five?

A Yeah.

Q And when you made your June 30th statement, did you tell the district attorney that you had just started seeing Mr. Harris?

A Yeah.

Q And when you went to speak to Mr. Warren, you did

not feel threatened, is that correct?

A Nope.

Q But, and you had also told Mr. Harris that you did not want to be involved in the case, correct?

A Right.

Q And you told Mr. Warren you didn't want to be involved in the case?

A Right.

Q And you told all the D.A.s that you did not want to be involved in the case?

A Right, because they got something called subpoenas.

Q And when you went to Mr. Warren's office, Mr. Warren didn't tell you what to say, correct?

A No, no.

Q Sorry?

A No.

Q Now, is it true -- now, it's true that you were a Blood, is that correct?

A Yeah.

Q And that you fought your way in, correct?

A Right.

Q And the other way to get in is by cutting someone, correct?

A Right.

Q And it's true that you were arrested?
A Right.
Q And it's true that you were first arrested for fighting your way into the Bloods, correct?
A Right.
Q And that you were arrested in the same park, the 23 Park, correct?
A Right.
Q And it's true that you had, you were arrested for petit larceny?
A Right.
Q And you did 12 months for that, correct?
A Uh huh.
Q Is that a yes?
A Yeah.
Q And you pled guilty to that, correct?
A Uh huh.
Q And it's true that everyone out there that night either was a Blood, correct, or was very familiar with the Bloods, correct?
A Where? At the time of the shooting?
Q On September 4, 2001?
A Yeah.
Q And so the only -- and it's true that you grew up with Corey McCollough, correct?

A Yes.

Q So the only thing that you say was untrue was that it was not Corey McCcllough that had the gun that day, correct?

A Right.

Q And everything else that you told Mr. Warren was true?

A Yeah.

Q Okay. Now, you said that Mr. Harris wanted you to say that you saw Corey McCollough shoot Dennis Brown, correct?

A Right.

Q But you didn't say that, did you?

A No.

Q And Mr. Harris never told you not to testify, correct?

A No.

Q And on the night of September 4th you were with also Roy Thompson, correct?

A Yeah.

Q And Roy Thompson actually ended up getting a bullet through his pant leg, correct?

A Yes.

Q And you saw the bullet hole through his pant leg?

A Uh huh.

Q But he wasn't hit?

A Ungh ungh.

Q Now, on the day when K was shot, it happened near your house, correct?

A Uh huh.

Q Sorry?

A Yes.

Q And the person that shot K was Travis Ragsdale, is that correct?

A I guess.

Q And you know Travis Ragsdale is a Blood?

A Travis Ragsdale wasn't a Blood.

Q Okay. And you called Latisha and Naia, correct?

A Yeah.

Q And sometime later that day you got a call from the detectives, correct?

A Yeah.

Q And you told them that everything was cool, no problems, correct?

A Right. No, I didn't get a call from the detectives. I was at Latisha's house. They called her.

Q They called her?

A Right.

Q And on the phone you guys told them that there were no problems, correct?

A I didn't speak to him.

Q Okay, but Latisha told him there was no problems?

A Uh huh.

Q And that nobody had approached you, right?

A Right.

Q And they explained to Latisha about, you know, if there was a problem they would relocate you and stuff like that, correct?

A No, not really.

Q And then the next day Latisha called the detectives back?

A I don't know how that went. I'm not Latisha. I can't speak for her.

Q Well, the next day, when did you next see Detective Brown and Detective Mosely?

A That next day or that night. Next day I think.

Q The next day on the 30th?

A Yeah. Yeah.

Q And Detective Brown -- I'm sorry, Detective Bond and Detective Mosely on the 30th, correct?

A Right.

Q Now, during your testimony at the Sykes' trial you told Mr. Warren that the whole tape that you did with him was a lie, is that correct?

A Uh huh.

Q But that wasn't true either, correct?
A It wasn't a lie. I was just keeping it based on me, my lifestyle.
Q Okay, but most of what you said on the tape was true?
A It was about me. Yeah, it was true.
Q So when you told Mr. Warren that the tape was a lie at the trial, that was not true?
A That it was a lie?
Q Right.
A Mr. Warren knew something wasn't right because he didn't even swear us in on the tape. Did you hear that?
Q Right, and you went and discussed it with him, correct?
A Right.
Q And you were joking with him, correct?
A Yes.
Q And you were having a nice time talking to Mr. Warren?
A Yeah.
Q But the first time that you said to anybody what you told Mr. Warren was a lie was after you spent sometime with Detective Bond and Detective Mosely, is that correct?
A Uh huh.
Q Is that correct?

A Yeah.

Q And before that you hadn't said anything, correct?

A Nope.

Q And did Detective Bond and Detective Mosely, they told you that you could be arrested, correct?

A Right.

THE COURT: When was this, please? When are we talking about counsel?

MS. RICHMAN: June 30th.

THE WITNESS: June 30th.

THE COURT: June 30th, all right. Thank you.

Q And they explained that they would move you and you would get taken care of, is that correct?

A Yeah.

Q And you expected something different than what you got, correct?

A No. Actually they didn't tell us. They told us that we had to go to the D.A.s office, that they want to talk to us. They didn't tell us we wasn't coming back. We didn't find out until we got to the D.A.s office.

Q So they took you themselves?

A Right.

Q Okay, and when they explained what they were doing with you with regard to relocation, they told you that they would give you money every week, correct?

A Yeah.
Q And a lot of times you were angry because it didn't turn out to be the right amount of money, correct?
A Yeah.
Q And in fact you had felt that, you had even called Mr. Benson a number of times, correct?
A Oh, yeah.
Q And you told him that you felt that he was being phonie also, correct?
A Uh huh.
Q And you said that he was being phonie just like the rest of them?
A Uh huh.
Q And you told him that you knew he had a lot of time when it came to Mr. Harris, correct?
A Uh huh.
Q And you felt you were getting used?
A Uh huh.
Q And you were mad?
A Uh huh.
Q And they had made you promises?
A Huh?
Q And in fact they had helped you get an apartment, but the apartment that you got you didn't like, correct?
A No, I loved the apartment.

Q First they got you in Section 8 housing, you didn't like that?
A No, I was in public housing projects.
Q And that's the one that you wanted, correct?
A Right.
Q And they helped you move and they helped you move your whole family?
A No, they helped me move. My family was on the street.
Q And at some point they took your whole family as well, right?
A No, they kicked them out of the hotel if you want to get technical.
Q Well, the first place they took you was to a hotel and you were there for a couple of weeks, correct?
A Uh huh.
Q And in fact at the end of July they kicked you out of the hotel, correct?
A My family. Not me, my family.
Q And they kicked, they kicked them out of the hotel? They called and complained to the district attorney's office, correct?
A Uh huh.
Q And they complained that your family and you were hanging out until all hours of the night in the lobby, is

that correct?

A Oh, no.

Q Is that what they said though?

A Yeah, that's what they said.

Q And they said you kept a infant in the lobby screaming the whole night, right?

A I never even heard of this.

Q And they were complaining because you were asking to take the van from place to place a lot, is that correct?

A Oh, I don't know. I wasn't at that hotel that you're talking about for that long.

Q Well, this is before you were kicked out, right?

A Yeah. But I wasn't there for a long time.

Q And at some point you had called the D.A.s office and you were, you were really mad because you said that the apartment they gave you, what they were doing for you was shit, is that correct?

A Uh huh.

Q And that you called and you said to the D.A. that he isn't doing shit for you?

A Uh huh.

Q And that when you moved to your new apartment you're not going to testify to anything, is that correct?

A Uh huh.

Q And then you got really mad when you found out

that A.D.A. Murphy said he wasn't concerned with your outbursts, isn't that correct?

A Uh huh.

Q And in fact when they first moved you in June, your mom got $1,000 from your old landlord, right?

A Uh huh.

Q And your family had Section 8 and public assistance and had not paid for your rent for that apartment for six months, correct?

A I don't know about that.

Q And when you needed stuff you would call the district attorney's office, correct?

A No, no.

Q Well?

A I just recently, we just started getting back in contact with them. They got in contact with me. I wasn't calling them for nothing.

Q Well, they would give you money, correct?

A This situation just came up like two months ago. They haven't been giving me nothing. They only been giving me something for two months ago.

Q On July 9, 2002, did you get a check for $2,142?

A Who?

Q Your family?

A No. Let me see this.

THE COURT: One second. Counsel, come up here, please.

(At this time, a bench conference was held off the record.)

THE COURT: All right, let's proceed.

Q At some point did you receive $478 that was signed for?

A From who?

Q The district attorney's office?

A When?

Q Delivered by --

A When?

Q 7/8/02 delivered by Mr. Wisher?

A Who was that for? When was that for?

Q For meals?

A Four hundred and what?

Q Four hundred and 78 dollars.

A I don't recall that.

Q This is on July 8th of 2002 which would be two years ago.

A How many people was that supposed to be for?

Q Well, your name is signed to it.

A But that wasn't just for me. It wasn't just for me.

Q Did you receive the sum of that money?

A I don't even remember a sum of that money. If they gave it to me, it wasn't just for me. It was like for me and three, four other people.

MS. RICHMAN: Your Honor, may we approach?

THE COURT: Counsel, approach please.

(At this time, a bench conference was held off the record.)

THE COURT: All right.

Q Now, Mr. Benson will treat some of this in his redirect, but you were receiving money from the district attorney's office on a weekly basis, is that correct?

A Say that again?

Q You were receiving money from the District Attorney's office on a weekly basis, is that correct?

A Yeah, I received $126 for food.

Q And sometimes they would give you the money in a lump sum in advance and tell you how long it had to last?

A No, they give me $126 a week every Monday. They don't give it all at once.

Q And they helped you get on public assistance?

A Yeah, they helped me get on public assistance, they helped me get housing. That's the only thing that good came out of this.

Q And if you missed an appointment, you dropped an appointment, they helped you get your application going

again?

A No. I was doing that.

MR. BENSON: I will stipulate that our relocation unit assisted in documentation and application.

THE COURT: Jurors, a stipulation between the attorneys means that there is no disagreements between the parties as to the substance of that stipulation, and you may accept it as part of the evidence in chief as if somebody came in and testified to it or as otherwise proved. It's accepted by the party and you may take it as evidence. Go ahead, counsel.

MS. RICHMAN: Thank you very much.

Q And at some point you would call the District Attorney's office and if you needed money they would actually drop money off to you, is that correct?

A That happened one time.

Q Only one time?

A One time.

MS. RICHMAN: Mr. Benson.

MR. BENSON: That I can't stipulate to until I know specifically what she wants me to stipulate to.

MS. RICHMAN: I guess we'll address that after, your Honor.

THE COURT: All right.

Q Now, Naia Hardison's son is your brother's son, correct?

A Uh huh.

Q And Latisha Smith was at one point your other brother Vincent's girlfriend, correct?

A No. You're talking about Tanisha Smith.

Q Tanisha Smith, and she was living with you at the time, correct?

A Uh huh.

THE COURT: Who?

MS. RICHMAN: Tanisha Smith.

THE WITNESS: Tanisha Smith.

THE COURT: Who is Tanisha Smith?

THE WITNESS: Latisha's sister.

Q And Ms. Smith's sister had actually done four years for rape and robbery of a 13 year old child, is that correct?

A I guess so.

Q And --

MR. BENSON: Excuse me, judge.

THE COURT: Are you objecting to this question?

MR. BENSON: Yeah.

THE COURT: Sustained, sustained.

MR. BENSON: I object to the relevance of

that.

THE COURT: Sustained.

Q And in fact the Smiths seemed to think that everything is a joke, is that correct?

MR. BENSON: Objection.

THE COURT: Sustained, sustained.

Don't answer the question as to what someone else thinks.

Q Well, at the time you were all living together, is that correct?

THE COURT: Who all?

MS. RICHMAN: Latisha and Tanisha Smith.

THE WITNESS: No, no.

THE COURT: Wait. Wait for the question, please. Let's know what the question is before you answer it. What is the question?

Q Was Tanisha Smith and Latisha Smith at any point living with your family in 2002?

A No.

Q Were you ever relocated together?

A Tanisha was.

THE COURT: Tanisha was relocated with you?

THE WITNESS: She was in the hotel for the time until they kicked her out too.

Q Now, at some point you had even beeped the

district attorney's office because you wanted change for laundry, is that correct?

A Yeah.

Q And they actually delivered?

A No, they didn't. No, that's a lie.

Q Well, when you -- they actually called to respond to you, is that correct?

A Yeah, they called to respond, but I don't --

Q And you were hostile to them, you told them not to bother?

A Yep, uh huh.

Q And at one point Naia just sort of skipped out of the relocation, correct?

A I'm Shaquanna Edmonds. I don't know about Naia Hardison. They'll be here for next week for you to ask them that.

Q Now, you said the D.A. had to call you to get Naia's number, is that correct?

A Yeah.

Q Because they couldn't find her?

A Something like that.

Q Now, you had at one point received $575 as a furniture allowance, is that correct?

A From who? Welfare?

Q From the District Attorney's office?

A No. I received $575 from the welfare, 500 from them.

Q And the only thing you were able to obtain with that was a queen size bed and kitchen table, correct?

A Yeah, from the welfare.

Q And you called the District Attorney's office attorney to get more money so you could get dressers, a living room set. Two TVs, is that correct?

A Yeah, but I didn't get it. They say I didn't need a TV.

Q And some weeks you would get $150 a week?

A Excuse me?

Q Some weeks you'd get $150 a week?

A Some weeks? No, no. Now, no, no.

Q January of '03, $150 for you and your son?

A When? In the beginning of the situation?

Q No.

THE COURT: What date are we referring to?

MS. RICHMAN: January 13th of '03.

THE WITNESS: '03, I was in my house at that time. You say January what?

Q Did you not receive $150 to cover two weeks during that time period?

THE COURT: When?

A What date was that?

Q January of '03?

A What date?

Q January 13th of '03.

A No, not that I remember.

MS. RICHMAN: You want to stipulate?

MR. BENSON: Yeah, I would stipulate to that document.

THE COURT: All right.

MS. RICHMAN: Your Honor, given the difficulty at this point, I don't know if you want counsel and I to work out the stipulation because to attempt to cross examine in this manner --

THE COURT: Would you approach, please?

(At this time, a bench conference was held off the record.)

Q Now, Ms. Edmonds, are you here because you want to be here today?

A Do it look like I want to be here?

Q Maybe not.

A All right, then.

MS. RICHMAN: Your Honor, subject to our discussions at the bench, because I'm now limited --

THE COURT: You'll have further opportunity to proceed with cross. Let's proceed with redirect.

REDIRECT EXAMINATION

BY MR. BENSON:

Q Ms. Edmonds, were you aware that when your family, you and your family were put in a hotel that a hotel could costs more than $100 a night?

A Uh huh.

Q So in a month, 30 times $100 could be $3,000?

A Yeah, because that wasn't going in our pockets.

Q I understand that.

A Yeah, you got to understand, we're not living a life of luxury. You're not putting it in our pockets. No, it wasn't a life of luxury.

Q Do you recognize thousands of dollars were spent on your family even though you didn't receive money in your pocket?

A Yeah.

Q So if it cost $3,000 or more a month to be in a hotel and $75 per week per person for food, that with you and your family members could add up to thousand of dollars over time. Do you understand that?

A Uh huh.

Q But in terms of getting $75 a week for food, $10 a day, did that seem like enough money when you had to be moved some place?

A No.

MS. RICHMAN: Objection, your Honor.

THE COURT: All right, rephrase the question please, counsel.

Q Let me ask it this way. In the beginning you worked with A.D.A. Solano on this case, right?

A Uh huh.

Q And you never received any benefit or any housing when A.D.A. Solano had the case?

A Yeah.

Q And then it was A.D.A. Murphy, is that correct?

A Uh huh.

Q And the only time money was spent was after you were relocated, after the thing with Bobby Gibson, is that correct?

A Right.

Q That's when your family went into a hotel?

A No.

Q Well, they moved you?

A That's when Dough Boy, we're starting back from Dough Boy. That's when ya'll put my family in a hotel like July to that beginning week of August.

Q July is when Bobby Gibson was killed?

A Right, July to like August.

THE COURT: Mr. Benson, was the date of that, I thought it was the 29th of June.

Q It was the 30th of June, the last day of June that

your family went to a hotel?

A No, they came and got them like a couple of days. After like two days after they came and got us.

Q First you were put in and then your family joined you?

A Yes.

Q So there were a few rooms that the D.A.'s office had to pay for?

A Yeah.

Q So you didn't feel that a lot of money went to you personally?

A No.

Q But you agree that it added up to thousands of dollars?

A It could have been. Could have been, I don't know.

Q And during most of that time you were working with Steve Murphy?

A Yeah.

Q And there were times did you get mad at them thinking that they weren't giving you enough food money?

A Yeah.

Q And then you and I have been working together for the last few months?

A Uh huh.

Q And did something happen where you had to be relocated from your, the public housing place, you were living in a hotel?

A Yes.

Q And did that require again for there to be money given to you for meals for you and your son?

A Right.

Q And have you had objections about the amount of money or the treatment that you received?

A No, I ain't complaining.

Q Now, about the laundry money, did you once call up and ask for laundry money?

A Uh huh.

Q What were you told? Were you told that the money was spent to keep you protected but not for things like laundry?

A Uh huh.

Q Did you get pretty angry about that?

A Uh huh.

Q Are you past that?

A Past it.

Q So put directly, are you testifying because people have paid for your family?

A No. I don't have a choice.

Q In fact who got permanent housing in your family?

A Me.
Q And where --
A Just me.
Q And where was your mother?
A I was taking care of them for two years.
Q And where was your mother supposed to be living?
A She was staying with me. She didn't have no choice. Remember we got kicked out? Well, you wasn't there. You should have had Murphy here.
Q You understood that you were the person being relocated in public housing?
A Yeah, but they shouldn't have told my mother they were gonna relocate her. That was the whole reason for her taking the $1,000 from the other apartment.
Q And you were hoping your mother could stay with you in a bigger place?
A Yes.
Q And it wasn't the place you wanted?
A Yes.
Q And you were mad?
A No, Mr. Murphy told me this $500 is for you to get your son a bed and a little odds and ends around the house. I asked him what about a TV and a dresser. "What do you need to look at TV for?" Same reason everybody in here like to look at TV.

Q Therefore, you had some gripes about the conditions under which you were relocated?

A Uh huh.

Q And were you told many times the purpose was for your safety, to be in a different place, that was the main priority?

A Yeah.

Q Are you testifying because you say that Turf gave you money when you went to Mr. Warren's office and because you had gotten relocation money from the D.A.s office?

A No. If I could give you your money back, him his money back, I would. If I could turn back the hands of time, I would. This is no way to live, walking around looking in everybody's face. This is not a life to live, not when you got kids.

Q I understand. I just have to ask you this thing about Corey McCollough and Corey Brown. Which of these guys were tougher, you know what I mean?

A Corey --

MS. RICHMAN: Objection, your Honor.

A -- Brown.

THE COURT: Sustained.

Q Well, Ms. Richman asked you about Corey Brown slapping Corey McCollough's girlfriend on some prior occasion. Remember that?

A Uh huh.
Q And you remember that?
A Yeah, and Corey McCollough went and got Snipes and Snipes did what he did for doing a favor and now look where he at.
Q But you don't know if Corey McCollough actually asked Corey to do the shooting?
A I don't have, no. That was between them.
Q So when she was asking you whether Corey McCollough was involved, you know that Corey Brown had previously embarrassed Corey McCollough by slapping his girlfriend?
A Uh huh.
Q And later Corey McCollough came to the park on September 4th with this guy who was a stranger, is that right?
A Right.
Q And the stranger, the guy with the messed up eye ended up shooting Corey Brown's brother?
A Right.
Q Was that over a Bloods dispute?
A No.
Q So why did you go to Mr. Warren's and say it was a Bloods dispute?
A Because that's what I was supposed to have said.

Q Who told you to say it?

A Turf.

Q And when you say that you went to the D.A.s office to start to tell them you didn't want to be involved in this case, when you heard the rumors, what rumors were those that you had heard?

MS. RICHMAN: Objection, your Honor.

THE COURT: Overruled.

A That he's a very tough guy, he kill people, he got money, he can get whatever he need, and if you don't do what he say --

Q Who is he?

A -- Turf, you might be in a body bag too. Put it like that.

Q Who were the people who told you that?

A It was the rumors. The whole neighborhood was scared of this guy right here.

Q What about Aaron Young, did he tell you that?

A No.

Q What about Mystie?

A Mystie told me that.

Q Did Aaron Young tell you that?

MS. RICHMAN: Objection. Leading.

THE COURT: Sustained.

Q Who told you that Turf wanted to talk to you?

A From the beginning it was Mystie.
Q Anybody else?
A No, it was Mystie know about it at the time. Then when he died, then we met Turf.
Q So the person who introduced you was?
A Aaron Young.
Q Mystie is no longer alive?
A No.
Q Did he ever tell you anything personally about Turf?
A No, he was just like talk to him.
Q He told you to talk to him?
A (Head gesture.)
MR. BENSON: I have nothing further.
THE COURT: Ms. Richman.
MS. RICHMAN: I'll ask for yet another stipulation from Mr. Benson.

RECROSS EXAMINATION

BY MS. RICHMAN:

Q It's your testimony that you did not receive approval for Section 8 housing and that you refused it, you wanted a housing project apartment?
A Say that again?
Q You were informed at one point that they had gotten you Section 8 housing, is that correct?

A Yeah, I did not want Section 8, I wanted housing.

Q And you refused it and you wanted housing and they got you a housing project?

A Yeah.

Q And it's not, you're testifying that they didn't close a lot of your accounts because you had missed appointments?

A No.

MS. RICHMAN: Mr. Benson I understand is going --

MR. BENSON: I'll stipulate to whatever she reads Detective Wisher reported on his report.

MS. RICHMAN: That Ms. Edmonds had missed a number of her appointments that was scheduled for her, and they had to reopen, the D.A.s office had to assist in reopening her cases for her.

MR. BENSON: I'll stipulate to that.

THE COURT: All right.

Q And Ms. Edmonds, you were told you were to refrain from associating with Naia Hardison, correct?

A Say that again?

Q You were told to refrain from Naia Hardison, told not to talk to her, correct?

A Yeah.

Q Now, in all of your testimony to date, you've

never mentioned Mystie, isn't that correct?
A Uh huh.
Q So this is the first day that you're mentioning Mystie, correct?
A Uh huh.
Q And according to you, it's Mystie that told you all these rumors and stuff, correct?
A No, Mystie didn't tell me all the rumors.
Q But you had testified before that it was Aaron Young who had said things to you about Mr. Harris and only Aaron Young, is that correct?
A Uh huh.
Q Is that a yes?
A Yeah.
Q And Ms. Edmonds, can you tell me what date you moved into your current house?
A July 20th. I mean January 20th, '02, '03.
Q January 20th of '03?
THE COURT: 20th or 28th?
THE WITNESS: 20th.
Q And can you tell me were you receiving money from the District Attorney's office on January 6th of '03?
A Yeah. I was still in the hotel, yeah.
Q And did you receive money from the District Attorney's office on December 30th of '02?

A That was on a Monday?
Q I believe so.
A Yeah.
Q But do you remember December 30th of '02?
A If it's on a Monday. We only get money from them on a Monday.
Q Well, I can get you a calendar if that would help you.
A I don't need a calendar.
THE COURT: Would you come up please, counsel.
(At this time, a bench conference was held off the record.)
Q And on the dates that you claim that Mr. Harris gave you money, who were you with?
A The witnesses. I was always around a group of people.
Q Always?
A Uh huh.
Q So the day that you were with Poo is when you received nothing?
A Right.
Q Do you know what date that was?
A It was in June sometime, miss. How many times you gonna ask that question.

Q And at no time did Mr. Harris threaten you, is that correct?

A No, he didn't. I wasn't scared at all. The one thing I can say, he did not threaten me. He was a nice guy. He's a nice gentleman. He really turned out to be something that -- you know how everybody said he was, I couldn't believe it and couldn't none of us, can't none of the witnesses get up and say he threatened us. He did not threaten us. He took us out, we had good fun times together, but this is where it leads to.

Q Did you ever go to a hotel with Mr. Harris?

A Yeah.

Q And then that relationship ended?

A It wasn't a relationship. That wasn't really nothing to talk about.

MS. RICHMAN: I have nothing further.

THE COURT: Is there any further redirect?

MR. BENSON: Just a couple of things.

REDIRECT EXAMINATION

BY MR. BENSON:

Q When you say he didn't threaten other people, you can't speak for every time you were with him, correct?

A Yeah.

Q And the threats you said were the threats you had heard from other folks?

A Uh huh.
Q But when he was with you he treated you nice?
A Yep.
Q You said that you went to a hotel with him. Did you ever have, did he ever make romantic overtures to you?
A It wasn't nothing to brag about, but yeah.
Q You said that he once gave you money for an abortion. He wasn't --
A No, he ain't had nothing to do with that.
Q And all that happened before Bobby Gibson was killed, the money for the abortion?
A I think so.
Q So when you went about June or July, if Bobby Gibson was killed on June 29th, then would that mean your abortion came before that?
A I'm not sure.
Q By the time of the trial?
A It was in July or June, Mr. Benson.
Q But it was before you went into a hotel, is that right?
A Right.
Q So it had to be at the end of June?
A Right.
Q Okay.
And with respect to Naia, there was a time when

you were told not to speak to Naia, is that correct?
A Uh huh.
Q Was there a relationship, was there a person known to somebody connected to her?
MS. RICHMAN: Objection, your Honor.
THE COURT: Sustained.
Q Do you know why you were told not --
MS. RICHMAN: Objection, your Honor.
A Yeah, because Naia --
THE COURT: Well, rephrase the question.
Q Defense asked, do you remember Ms. Richman asking you if you were told to stay away from Naia?
A Yeah.
Q Why were you told to stay away from Naia?
A I was told to stay away from Naia because her baby father side of the family supposed to be Turf best friend.
Q What was the nickname of that person?
A Nutso. Some name. It start with a N, Nutso, Nitso.
Q There was a time when you were --
MS. RICHMAN: Objection, your Honor.
THE COURT: Sustained.
MR. BENSON: Relocation.
THE COURT: Well, all right. There is a foundation.

Q There was a time when you were relocated and you were told not to be in touch with Naia where ever she was relocated?

A Right.

Q To keep everybody separate?

A Uh huh.

Q And did you break that instruction sometimes?

A Yeah.

Q You guys kept talking to each other?

A Yeah, because all we got is each other. We don't have no friends. We don't have nothing.

MR. BENSON: I have nothing further.

RECROSS EXAMINATION

BY MS. RICHMAN:

Q So you specifically told the District Attorney's office that Dupree Harris never threatened you, is that correct?

A No. Right, he didn't.

MS. RICHMAN: I have nothing further.

THE COURT: Is that it?

MR. BENSON: Nothing more.

THE COURT: Okay, thank you Ms. Edmonds. You may step down.

(At this time, the witness exited the courtroom.)

THE COURT: All right, I believe that's it for today, is that right?

MR. BENSON: Yes, your Honor.

THE COURT: All right.

MS. RICHMAN: Your Honor, may we approach just briefly?

THE COURT: Yes.

(At this time, a bench conference was held off the record.)

THE COURT: I think there are a couple of issues here.

During the jury selection process there were a number of individuals who mentioned next Monday and Tuesday as holidays, religious holidays. Is there anyone here among the jurors who is observing Monday and Tuesday or one of those days as a religious holiday?

MR. STRASSBURG: Yes, but I'm observing Tuesday. But I, you know, I can appear. I'm fasting but I can appear.

THE COURT: In other words, it doesn't preclude you from being present?

MR. STRASSBURG: No, I can be present.

THE COURT: Your observance is personal for you?

MR. STRASSBURG: Yes.

THE COURT: We don't have to be concerned about you being here on Monday?

MR. STRASSBURG: Monday definitely. Tuesday is a fast day, but it doesn't preclude me from coming.

THE COURT: All right jurors, we're going to recess for the weekend. As I told you, we'll not be sitting on this case on Fridays, so you have tomorrow off. That also means you're not getting credit for jury service and I have to tell you that because I know some people have employment responsibilities and whatever, and you have to be aware that you will have to report where ever. But you are required to be back on Monday. So if you'll be in your jury room, I'm going to ask you to be here at 9:45. And if -- you have that phone number in case something happens, and be back here and ready to go forward on Monday morning. But do let us know if something intervenes. But in the meantime, please avoid any press reporting of any kind regarding this trial, and don't discuss the case. I know you've heard it many times. I'm trusting you're observing those admonitions, to keep your thoughts to yourselves and not let anybody else intrude into your own evaluation of the case. So I'll see you on Monday at 9:45. Have a good weekend.

(At this time, the jury exited the courtroom.)

THE COURT: Now, I understand that counsel wishes to discuss the stipulation of some kind regarding --

MS. RICHMAN: Your Honor, I apologize. I know that Mr. Benson has a dental appointment you have to go to. I can do this on Monday.

MR. BENSON: I got a few minutes.

THE COURT: What I want to know is know where you're going with this so we don't have to spend a lot of court time. Mr. Benson you're intending to call a witness who will be able to describe what compensation or consideration or whatever you call it was given to Ms. Edmonds and to the individuals, is that right?

MR. BENSON: Mike Wisher is on the list. I expect, if I don't stipulate I'll call either Mike Wisher or somebody who's even in charge of the program that might be able to answer the questions more directly, succinctly and keep it in a flow so we don't have it disjointed.

The Court should know that I turned over the relocation records to defense counsel in the same way that I had them, but I redacted all addresses and locations. But the names of people and the amounts of

money were there. This is the problem. That's the way they do their accounting. Every bit of money that was disbursed was added up. But there were times when a detective would disburse certain sums of money and then get compensated in irregular intervals so that while every weekly disbursement of $75 for food was recorded or $450 for a group of people was recorded, they were, they were disbursed throughout the paperwork, checks to detect those in the amount of thousand of dollars. So it wasn't regular. It's not easy to follow which disbursements are covered by a particular check. But it was equally difficult for me and the easiest thing to do was give defense counsel all the papers. I never went through a process of dividing or accounting to try to give her a sum total. I don't know if that's even possible because the amounts of money spent for --

THE COURT: All right, but I would just note in Ms. Richman's defense to some extent that she has some questions to a sum of money in the amount of $4,000 that was based on a check cut to Mr. Wisher and actually a lump sum to the witnesses and that's not the way it worked at all. So the witnesses also didn't know this. The witness would not have any way of knowing these amounts were being disbursed in this way and she couldn't respond either. So we have kind of a

draw here.

MS. RICHMAN: Well, my concern, your Honor, I think I was somewhat impeded in my cross examination because I had designed a cross around the documents. My concern is that lost for Mr. Harris and then has my effectiveness somehow been tainted.

THE COURT: Well, is the purpose here to elicit the fact that vast sums of money were extended on provisions given to this witness over the course of time? You did elicit other things, demands in excess of that and you certainly elicited hostility. She had other people. I do not see that you impeded in anything personal to her. It's just the amount of money we were concerned with.

MS. RICHMAN: It's the amount of money and also my ability to ask and the cross examination for the benefit of my client.

THE COURT: Perhaps when Mr. Wisher, detective Wisher testifies or whoever testifies, the jury will understand why this problem arose, and it certainly will not be a disadvantage to you. I'm sure that they observed that from the bench conference that was going on, and it wasn't your inadequacies at all that were causing the problem. So I don't think there would be any prejudice to your client in that regard,

and we can clear it up one way or the other because it would be up to you to have a requisite of knowing how much money. We'll call the witness. By resolving the whole thing or some satisfaction on both sides, that you can work out on Monday.

MS. RICHMAN: We'll speak together tomorrow.

MR. BENSON: I'm going to try to get her the things she wants. There's some more felony records that came in that she wants before Latisha and Naia testifies. So I'll see which ones we have. I'll probably call first the one whom we have phone records.

MS. RICHMAN: We'll speak tomorrow.

(At this time, the matter was adjourned to July 26, 2004, Part 16.)

REPORTER'S CERTIFICATION

I hereby certify that the foregoing is a true and accurate copy of the stenographic proceedings held in the above matter.

SANDRA WILKES, RPR
Senior Court Reporter